MOORE, J.
 

 |! Christopher Shivers appeals the judgment of the trial court denying his request for relocation and the award of sole custody of the child, Cortavious Shivers, to his mother, Betty Shivers, and which allows Christopher only supervised visitation; Christopher also appeals the court’s denial of his request for child support, and he appeals the court’s award of interim spousal support some 18 months after the divorce. For the following reasons, we reverse in part, affirm in part, render judgment, and remand to the district court.
 

 FACTS AND PROCEDURE
 

 Christopher and Betty Shivers were married on June 29, 2002. They had one child together, Cortavious, who was born 5 years prior to the marriage on October 18, 1997.
 

 The couple separated on December 26, 2005, when Betty moved out of the matrimonial domicile. Cortavious remained in the care and physical custody of Christopher for 2½ years until July 1, 2008, when the court rendered an interim judgment ordering the parties to alternate custody for two-week periods until a final custody decree.
 

 After she moved out of the matrimonial domicile, Betty filed for a divorce based on adultery on February 13, 2006. Christo
 
 *502
 
 pher answered and filed a reconventional demand for a divorce per C.C. art. 102 and child support on March 23, 2006. A judgment of divorce, Judge Nesbitt presiding, was granted on February 2, 2007, pursuant to a Rule To Show Cause for 102 Divorce and Joint Custody filed by Betty on January 19, 2007. In addition to the divorce, Betty’s rule requested that the court award joint custody of ^Cortavious, name her as the domiciliary parent, and give Christopher reasonable visitation. She also prayed for an award of child support and permanent spousal support (alleging that she was free from fault). However, Judge Nesbitt’s judgment determined none of these incidental matters including custody, child support and spousal support, except dissolution of the community of ac-quets and gains retroactive to February 13, 2006, the date of Betty’s 103 divorce petition.
 

 Christopher remarried on September 29, 2007.
 

 Things came to a head again when on June 9, 2008, Christopher, a GM employee, filed a Petition and Rule for Order Allowing Minor Child to Relocate to Arlington, Texas, approximately 250 miles away. Christopher initiated the transfer due to the well-known recent downturn in GM’s fortunes. Because he worked “second shift,” which was likely to be shut down for some time, he was advised that he would have a, better chance of keeping his GM job if he transferred to Arlington. The transfer was approved, and he was ordered by letter dated May 27, 2008 to report to the Arlington Plant on July 16, 2008. A hearing on the rule to relocate was set for July 1, 2008.
 

 Betty answered the petition to relocate with a “Rule to Show Cause For Joint Child Custody, Child Support, Spousal Support, and Partition of Community Property. In her rule, Betty requested that the court award the parties joint custody of Cortavious, name Betty as domiciliary parent and give Christopher reasonable visitation. Betty alleged that Cortavious should be allowed to remain in the Shreveport/Bossier City area because that has been his home, he is familiar with the schools, and she can provide a safe, |shealthy, loving environment for the child.
 

 Betty also alleged that, at the time of the separation, Christopher withheld visitation of Cortavious and another, older son by another man, Rodriguez, and whom Christopher was also raising. She alleged that Christopher refused to return either child to her. Four or five months after the separation, she brought the police to Christopher’s house, and Christopher returned Rodriguez, but kept Cortavious. We cannot determine from this record whether Christopher had an interim sole custody decree as claimed.
 

 At the July 1, 2008 hearing, the court, Judge Wyche presiding pro tempore, did not rule on Christopher’s motion to relocate nor Betty’s rule for permanent joint custody. Instead, the judge met with the parties in chambers to attempt to reach an agreement; ultimately, the court issued an interim order which required the parties to alternate custody of Cortavious every two weeks.
 
 [1]
 
 The court also re-appointed Sandi Davis, LPC, as a mental health expert and child custody-visitation evaluator. Ms. Davis had previously evaluated the parties in the case pursuant to J. Nesbitt’s appointment in 2006. The evidentiary hearing was re-set for August 18, 2008.
 

 
 *503
 
 The transcript of the August 18, 2008 indicates that the court was unwilling to take up the matter of relocation when it learned from Betty’s counsel that Betty had filed for a temporary protective order in Bossier Parish against Chris alleging physical abuse. Chris stated that he had not been served with any protective order inasmuch as he had been living in Arlington|4and that the allegations were groundless because he was not living in Louisiana. The court, however, was concerned with the ramifications of the Post-Separation Family Violence Relief Act on the proceedings, namely La. R.S. 9:364, which creates a presumption that no parent who has a history of perpetrating family violence shall be awarded sole or joint custody of children. The court determined that it would only issue an interim custody and child support order until the protective order matter was resolved. The parties told the court that they had reached an agreement as to their respective incomes and the respective amount either would owe in monthly child support depending on how the court ruled on the custody issue.
 

 Responding to questions by the court, Ms. Shivers stated that she lived alone on Nina Street in Bossier City with her other 14-year old son. She stated that she was employed by Diamond Jack Casino as a money counter. The court then issued an “interim judgment” awarding joint custody to the parties and designating Betty as domiciliary parent. Christopher was given visitation of one weekend per month. The court also awarded Betty child support of $617.65 per month effective August 15, 2008 and ordered Christopher to pay interim spousal support of $937.00 per month for the next 12 months, which award ostensibly covered the period from February 1, 2006 to February 1, 2007, that is, the roughly one-year period from the time Betty filed her 103 divorce petition on February 13, 2006 until the divorce was granted February 2, 2007. Christopher’s motion to relocate and his request for interim child support for the period he had custody of Cortavious was not taken up. The case was continued.
 

 1,-,Christopher subsequently filed a motion for a hearing which was set for November 7, 2008. Trial was held on November 7 and December 10 of 2008.
 

 At the hearing on November 7, several witnesses testified in support of Christopher’s relocation, which we briefly summarize:
 

 Officer Keith Hardin testified that Mr. Shivers called Bossier police after he found his son walking in Betty’s neighborhood without supervision and inappropriately dressed for the summer heat. Officer Hardin testified that the neighborhood where Cortavious was walking had a bad reputation. Ms. Shivers arrived at the scene and told him that Cortavious was allowed to go outside and play.
 

 Morgan Johnson, president of UAW 2166, the local union representing workers at GM, testified regarding several discussions with Mr. Shivers about transferring to the Arlington plant because it was very likely that the second shift that he worked on at the Shreveport plant would be eliminated. That shift was, in fact, subsequently eliminated in September of 2008. Although his application to transfer was voluntary, it offered a better chance for Mr. Shivers to remain employed.
 

 Sandi Davis, LPC, was twice appointed by the court to conduct an evaluation and visitation plan and report to the court. She met with Chris, Betty, and Cortavious individually, and also jointly with Cortavious and each parent. She also held a joint meeting with Chris and Betty in an unsuccessful effort to resolve the custody dispute. She testified that Betty walked out
 
 *504
 
 of the meeting and that she was not rational.
 

 | «Regarding custody of Cortavious, Ms. Davis was concerned about Cortavious’s interest in gangs in the neighborhood where Betty resides. This concern was prompted by several drawings Cortavious made (and supplied to her by Chris) of gang-related activity, with characters wearing the colors of the Crips and Bloods with masks over their faces. Ms. Davis questioned Cortavious regarding the drawings. She said that Cortavious confirmed they were his and said he considers joining a gang and being around gang friends when he was at his mother’s house. He said he liked the “colors,” and that his friends that he hung out with were the ones who talked to him about it.
 

 Ms. Davis stated that Cortavious told her that his father was more strict than his mother regarding his clothing. Cortavious also told her that there were times at his mother’s house when he did not know her whereabouts. He mentioned that once he and his uncle had to walk to another place to get water, and another time, there was no food in the house.
 

 Ms. Davis expressed concern about some of Betty’s family members with whom Cortavious spends time and had previously been involved in criminal activity. Betty’s niece, Emily, was serving a sentence of juvenile life, while another, DeMarcus, a 14-year-old cousin with whom Cortavious spends time with, was arrested or incarcerated for shooting someone. Both are apparently no longer incarcerated. She said that Betty was worried about the influence these people might have on her son and that she would monitor it more closely. Ms. Davis believed that Cortavious already has been unfavorably influenced by this environment.
 

 Ms. Davis testified that, as of July 8, 2008, Betty told her that she was living at her home at 2178 Nina Street in Bossier City. She said that Betty |7told her that her daughter Corinthia, Corinthia’s boyfriend Allan, their son, Jerdel, and Betty’s other son, Rodriquez, lived in the two-bedroom, one-bath home. Chris told Ms. Davis that Betty’s parents and her cousin Emily also live in the home, although Betty stated that her parents live in an apartment on Montgomery Street. Betty stated that she also owns the house at 2182 Nina Street.
 

 Ms. Davis acknowledged that Betty told her that Chris had physically abused her; however, she was unable to substantiate any incidents of physical abuse in her interviews with Cortavious and Corinthia. Corinthia said Chris threatened her boyfriend, Allan, because he disclosed to Betty that he saw Chris in a McDonald’s restaurant with another woman.
 

 Ms. Davis testified that Betty admitted that she had a gambling problem in 2001; whether this has been resolved is not clear from the record. She also testified regarding Betty’s prescriptions for depression including some anti-depressant and anti-psychotic drugs; however, the record is unclear whether these medications are still being prescribed. Most of them appear to have been prescribed in 2001 and shortly thereafter.
 

 Joseph James, a minister and long-time friend of both Chris and Betty Shivers, testified that he was present when Betty moved out of the house. He had previously tried to help the couple work out their differences. On that day, Betty told him that she had had enough, and she took her things and left, leaving Cortavious, Rodriguez, Corinthia and her boyfriend. He did not observe any physical altercations between Betty and Chris; however, he did observe Chris verbally abuse her during
 
 *505
 
 arguments. He considered Betty to be a good mother.
 

 IsGinger Shivers, Chris’s current wife, was an elementary school teacher for nine years, but she is now unemployed and living in Arlington with Chris. Ginger testified that she married Chris in September of 2007. She had moved into the house with Chris in July of 2007. She said that Cortavious lived in the house as well. Betty exercised her visitation weekly on Tuesday, Friday and Sunday. On the weekdays, she would pick Cortavious up from school and return him to Chris’s house between 8:00 and 9:00 p.m. On Sundays, she had Cortavious from 2:00 p.m. or earlier until approximately 8:30 p.m. She stated that Betty never contributed anything to the household for the care of Cortavious.
 

 Ginger stated that she observed that Cortavious was upset about a gang named the K-side gang or Kelly Street Gang, and that he was throwing up gang signs. Ginger stated that she never saw any physical abuse, but she did witness Betty and Chris shouting at each other and verbally abusing each other.
 

 Regarding her current household with Chris, Ginger stated that there are two other children in the house, Cortavious’s half-brother, Christopher, and her daughter, both age 15. Cortavious would share a bedroom with Christopher in the three-bedroom, two-bath home. She stated that she was willing to facilitate visitation with Betty Shivers if Cortavious’s primary residence is in Arlington.
 

 Christopher Shivers testified regarding his transfer to the GM plant in Arlington. He currently works on the day shift in Arlington from 6:00 a.m. to 2:30 p.m.
 

 | flChristopher testified that he had taken care of Cortavious from the time he and Betty separated in 2005 until June 16, 2008 when he had to report to work in the Aldington plant. He said that he also took care of Rodriguez for about four months before Betty came and got him. He said that Betty did not start exercising visitation until in 2006 when J. Nesbitt sent them to Sandi Davis to work out a visitation schedule.
 

 Christopher said that Betty wras a good mother and a good wife, but that her family was involved in gangs. He testified that Betty’s nephew, that is, her sister’s son, DeMarcus, shot and killed a man on Shed Road in Bossier. He said that if you pulled up Cortavious’s “My Space” page, you would see a photo of this boy with guns, along with photos of Betty’s other nephews. He was upset because, when he was at Betty’s, Cortavious was allowed to hang around with this boy, as well as roam the neighborhood unsupervised. According to Chris, this led to many verbal altercations between Betty and Chris.
 

 Chris testified that he has never struck Betty in the 12 years they have been together. He said that recently while he was working in Arlington Betty obtained a restraining order against him from a Bossier court for allegedly threatening to beat her up, even though the divorce proceedings were being held in Caddo Parish. He said she also filed a restraining order in Benton when they first filed for divorce claiming that he strangled her. He denied these incidents.
 

 He stated that while they were married, Betty sometimes would not come home for as long as two days, then she would call the police before she went home so that she would not have to listen to him fuss at her. But he |ininsisted that it was never because he hit her.
 

 Chris attributed the break-up of the marriage to Betty’s gambling. He said that one evening in October of 2005, he got off early from the night shift. He came home to find that his seven-year-old daughter
 
 *506
 
 and Cortavious were home alone. Betty arrived shortly thereafter with one of her friends, but would not tell him where she had been. He said she told him that she had been raising kids all her life and she felt like she had not lived. They separated a few months later.
 

 Chris stated that Betty’s use of antidepressant medications about which Ms. Davis testified actually arose from him leaving her in 2001 after he became fed up with her staying at the “boats” to gamble and not coming home. More recently, he said that Betty allows Cortavious to stay on the telephone into the early morning hours while he requires the child to go to bed at 9:00 p.m., and he is not allowed on the computer or telephone after that time.
 

 After Chris closed his case, the court continued the matter to December 10, 2008. When the parties appeared on December 10, Betty’s counsel elected not to put on any evidence. The court then ruled from the bench. It denied Chris’s motion for relocation and awarded Betty sole custody of Cortavious. As the trial judge gave her reasons for its conclusion that the statutory factors considered by the court favored Betty, Christopher got angry, pounded his fist on the table and stormed from the courtroom. At this point, the court stated that, due to the outburst, instead of awarding joint custody to the parties, she now would award Betty sole custody and allow Christopher only supervised visitation for four hours on Saturday and Sunday |nafternoon twice a month. The interim child support to Betty was made permanent along with the past interim spousal support. She denied Christopher’s request for interim child support for the 2⅜ years he had interim custody of Cortavious.
 

 Christopher filed this appeal, alleging that the court erred in denying his petition for relocation, in awarding Betty sole custody and giving him only supervised visitation, in denying his request for child support, and in awarding Betty interim spousal support 18 months after the divorce.
 

 Discussion
 

 By his first two assignments of error, Chris argues that the trial court erred in denying his motion to relocate and in awarding sole custody to Betty while giving him only supervised visitation.
 

 In this case, neither a permanent nor considered custody decree had been rendered prior to Chris’s motion to relocate the child. Chris had interim sole custody for over 2½ years while the parties waited for a hearing and ruling on permanent custody and other incidental matters. When Chris filed a petition to relocate to Arlington with the child, the issue of permanent custody and other matters resurfaced.
 

 The trial court in this case merged the motions for joint custody and the matter of relocation since the paramount goal in both analyses is to determine the “best interest” of the child. While many of the analytical factors under each determination are similar, there are obviously different considerations as well, since relocation can have a great impact on the non relocating parent.
 

 | i?The paramount consideration in any determination of child custody is the best interest of the child. La. C.C. art. 131;
 
 Evans v. Lungrin,
 
 1997-0541 (La.2/6/98), 708 So.2d 731. The court is to consider all relevant factors in determining the best interest of the child. La. C.C. art. 134.
 
 [2]
 
 Factors that may be considered are
 
 *507
 
 set forth in Art. 134, but the court is not bound to make a mechanical evaluation of each. Rather, a custody dispute must be decided in light of its peculiar set of facts and the relationships involved in order to reach a decision that is in the best interest of the child.
 
 Earle v. Earle,
 
 43,925 (La.App. 2 Cir. 12/3/08), 998 So.2d 828,
 
 writ denied,
 
 2009-0117 (La.2/13/09), 999 So.2d 1151;
 
 Wages v. Wages,
 
 39,819 (La.App. 2 Cir. 3/24/05), 899 So.2d 662.
 

 The trial court’s findings in child custody matters are entitled to great weight and will not be disturbed on review without a showing of clear abuse.
 
 Bergeron v. Bergeron,
 
 492 So.2d 1193 (La.1986). Further, acts of adultery do not necessarily render a parent morally unfit who is otherwise suited to custody.
 
 Earle v. Earle, supra; Slack v. Slack,
 
 26,036 (La.App. 2 Cir. 8/17/94), 641 So.2d 1059.
 

 | i;iA parent seeking to remove his or her child from the jurisdiction of the court has the burden of proving that: (1) the move is made in good faith; and (2) the move is in the child’s best interest. La. R.S. 9:355.13;
 
 Payne v. Payne,
 
 41,049 (La.App. 2 Cir. 5/19/06), 930 So.2d 1181,
 
 writ denied,
 
 2006-1871 (La.8/9/06), 935 So.2d 130;
 
 Blackburn v. Blackburn,
 
 37,006 (La.App. 2 Cir. 1/29/03), 836 So.2d 1222. In determining the child’s best interest, the court shall consider the benefits which the child will derive either directly or indirectly from an enhancement in the relocating parent’s general quality of life. La. R.S. 9:355.13.
 

 In reaching its decision regarding a proposed relocation, La. R.S. 9:355.12 requires the court to consider the following factors:
 

 (1) The nature, quality, extent of involvement, and duration of the child’s relationship with the parent proposing to relocate and with the nonrelocating parent, siblings, and other significant persons in the child’s life.
 

 (2) The age, developmental stage, needs of the child, and the likely impact the relocation will have on the child’s physical, educational, and emotional development, taking into consideration any special needs of the child.
 

 (3) The feasibility of preserving a good relationship between the nonrelocating parent and the child through suitable visitation arrangements, considering the logistics and financial circumstances of the parties.
 

 (4) The child’s preference, taking into consideration the age and maturity of the child.
 

 (5) Whether there is an established pattern of conduct of the parent seeking the relocation, either to promote or thwart the relationship of the child and the nonrelocating party.
 

 
 *508
 
 (6) Whether the relocation of the child will enhance the general quality of life for both the custodial parent seeking the relocation and the child, including but not limited to financial or emotional benefit or educational opportunity.
 

 |m(7) The reasons of each parent for seeking or opposing the relocation.
 

 (8) The current employment and economic circumstances of each parent and whether or not the proposed relocation is necessary to improve the circumstances of the parent seeking relocation of the child.
 

 (9) The extent to which the objecting parent has fulfilled his or her financial obligations to the parent seeking relocation, including child support, spousal support, and community property obligations.
 

 (10) The feasibility of a relocation by the objecting parent.
 

 (11) Any history of substance abuse or violence by either parent, including a consideration of the severity of such conduct and the failure or success of any attempts at rehabilitation.
 

 (12) Any other factors affecting the best interest of the child.
 

 Although R.S. 9:355.12 mandates that all the listed factors be considered, it does not require the court to give preferential consideration to any certain factor or factors.
 
 Curole v. Curole,
 
 2002-1891 (La.10/15/02), 828 So.2d 1094,
 
 Martin v. Martin,
 
 44,020 (La.App. 2 Cir. 12/3/08), 3 So.3d 512. The district court is vested with great discretion in matters of child custody and visitation; its determination is entitled to great weight and will not be disturbed absent a clear showing of abuse of that discretion.
 
 Id; Payne v. Payne, supra.
 
 An abuse of discretion will not be found if the record supports the trial court’s conclusions.
 
 See, e.g., January v. January,
 
 94-882 (La.App. 3 Cir. 2/1/95), 649 So.2d 1133.
 

 In this case, the trial court found that Chris’s relocation was made in good faith; however, it found that none of the factors under La. R.S. 9:355.12 favored Chris and virtually all of the factors favored Betty. It concluded that it was in the best interest of Cortavious to deny the relocation and to award hfiBetty sole custody and allow Chris only supervised visitation.
 

 After a complete review of the record of this and all prior proceedings, we are constrained to conclude that the trial court’s ruling awarding Betty sole custody of Cortavious and giving Chris supervised visitation constituted an abuse of discretion. Clearly, it is in the best interest of the child that the parents be awarded joint custody under a standard joint custody plan. It remains to be determined whether Chris should be made domiciliary parent and allowed to relocate Cortavious.
 

 Other than her responses to interrogatories, which are not subject to cross-examination, the record in this case is essentially devoid of any testimonial evidence that it is in Cortavious’s best interest to award Betty sole custody or deny Chris joint custody and deny the relocation. Betty elected not to put on any evidence to support the allegations in her petition or to rebut the evidence presented by Mr. Shivers that it would be in the best interest of Cortavious to allow him to relocate with his father. The testimony of Sandi Davis, LPC, the court appointed expert whose testimony strongly favored Mr. Shivers in a “best interest of the child” evaluation, was unchallenged; nor did the court find that Ms. Davis’s evaluation was not credible. Although Betty’s counsel frequently used her cross-examination of Chris’s witnesses to “load” her questions with factual assertions, or to make inappropriate rhetorical comments and assertions, such as referring to Chris as a “liar and adulter
 
 *509
 
 er,” these statements do not constitute facts and cannot be considered by the court in its determination.
 

 We are aware that the court might have reached its conclusions based on conversations with counsel and the parties in chambers or Chris’s |1fidemeanor during proceedings. However, chambers conversations do not constitute evidence to render a judgment.
 

 The court reacted harshly when Chris became upset and showed a hostile attitude toward the court during trial and as the court ruled against him on the custody and relocation issues. A contempt ruling would have been appropriate in these circumstances. However, we do not believe it is in the best interest of Cortavious to deprive him of the relationship with his father because of the outburst in court.
 

 We also observe that the court in several instances based its decision to deny Chris custody and deny the relocation by its conclusion that the cause of the dissolution of the marriage was Chris’s adultery rather than a determination of the best interest of Cortavious.
 

 For example, in considering the feasibility of preserving a good relationship between the non relocating parent and the child through suitable visitation arrangements, considering the logistics and financial circumstances of the parties, the court stated that although Mr. Shivers needed to relocate to keep his job, “if he hadn’t been having an affair and hadn’t gone and married someone else after he had that affair Ms. Shivers would have been moving with him.”
 

 As previously stated, Mr. Shivers responded to the court’s remark by pounding his fist on the table and walking out of the courtroom. Although the trial judge did not return to this factor, it is clear that she concluded that this factor favored Betty because of Chris’s alleged adultery.
 

 Contrary to the court’s analysis, this factor requires the court to simply consider whether, considering logistics and costs, it is feasible for the | ^nonrepeating parent to preserve a good relationship with the child. In this instance, Alington is 250 miles from Shreveport. Mr. Shivers testified that he comes to or through Shreveport frequently to visit his other children in Coushatta. He also expressed a willingness to bring Cortavious or meet Betty halfway so that she could have visitation. Given the reasonably close proximity of Alington to Shreveport and the willingness and ability expressed by Mr. Shivers to facilitate visitation of Cortavious with his mother, it was error for the court to essentially rule otherwise.
 

 Aother example is the court’s analysis of factor 8, which calls for the court to consider the current employment and economic circumstances of each parent and whether or not the proposed relocation is necessary to improve the circumstances of the parent seeking relocation of the child.
 

 The court reiterated its belief that Mr. Shivers moved to Alington to maintain his employment, but concluded that the factor still favored Ms. Shivers because:
 

 ... the fact that he brought women into the house and he had affairs and was doing all kinds of things and Ms. Shivers eventually divorced him ... .is the reason all this is going on. I think that these are choices that Mr. Shivers has made. So I think this favors Ms. Shivers. I think she has employment, I think she’s keeping her employment, and I think that she has a support system here that will help her.
 

 We are unable to find in this record any testimony that Chris brought women into the house, etc. We are concerned that the trial court used the custody award and
 
 *510
 
 blocked Cortavious’s relocation in order to punish Chris for
 
 alleged
 
 past behavior when there is no proof that his behavior had any detrimental effect on Cortavious. “An award of custody is not a tool to regulate human behavior. The only object is the best interest of the child.”
 
 Cleeton v. Cleeton,
 
 383 So.2d 1231 (La.1980). “Acts of adultery do not necessarily render a parent morally unfit who is otherwise suited to custody.”
 
 Earle v. Earle, supra.
 

 The first and second factors in determining the best interest of the child for purposes of relocation more closely parallel the factors in determining custody. The first factor requires the court to consider “the nature, quality, extent of involvement, and duration of the child’s relationship with the parent proposing to relocate and with the nonrelocating parent, siblings, and other significant persons in the child’s life.”
 

 The court stated that if Mr. Shivers were still living in Shreveport, there would be a relationship, but since he had moved to Arlington, there was not as much of a relationship. It also stated that it believed the child had a good relationship with the mother. It concluded that this factor favored neither party because both parents had custody of Cortavious at different times.
 

 The record indicates, however, that Chris had sole custody of Cortavious from the time of separation in December of 2005 until July 1, 2008 when the court ordered that the parties exercise joint physical custody on a 50-50 basis
 
 after
 
 Chris filed a petition to relocate. During the period prior to July 1, Betty exercised afternoon and early evening visitation with Cortavious three days a week, but rarely had overnight visitation. This was likely due to the fact that days in which she could exercise visitation were school nights, and Cortavious went to school in Caddo while Betty lived in Bossier. Thus, although it appears that Cortavious had a good relationship with his mother during this time period, it is clear that Cortavious spent much 113more time with his father than his mother. It is also clear that Chris supplied all of Cortavious’s needs during this time, including all food, clothing and shelter.
 

 The record of testimony also indicates that much of the time while Cortavious was in his mother’s custody, he was under the supervision of his older half sister, Corinthia, and he was permitted to do pretty much as he pleased. This was essentially unrebutted. Sandi Davis expressed concern over Cortavious’s interest in gangs in his mother’s neighborhood as well as his close contact with family members around the house who apparently have been in trouble.
 

 The second factor requires the court to consider “the age, developmental stage, needs of the child, and the likely impact the relocation will have on the child’s physical, educational, and emotional development, taking into consideration any special needs of the child.”
 

 The court concluded that this factor favored Betty. It noted that Cortavious had no special needs, but needed to be somewhere where his life is stable, where he has different activities and people who are going to take care of him. The court concluded that Betty has been his mom and has been there for him, and that she understands his needs and would be the parent most likely to facilitate the needs of the child under this factor.
 

 The proper inquiry here, however, calls for analysis of the likely impact of relocation considering the child’s age, stage of development and needs. The evidence for analysis under this factor obviously favors
 
 *511
 
 Mr. Shivers to a considerable degree. Sandi Davis testified that Cortavious apparently got along well with his stepmother, Ginger, who has been an 12oelementary school teacher for nine years, but is currently not teaching and remains at home. If Cortavious lived in Arlington, he would share a bedroom with his half-brother, Christopher, who is several years older than Cortavious. The only other person in the house would be Ginger’s daughter by a prior marriage. By contrast, it is not exactly clear who and how many people live in Betty’s home. On August 18, Betty told the court that she lived alone with her son, Rodriguez. However, Sandi Davis testified that Betty reported to her just one month earlier that her daughter Corinthia, Corinthia’s boyfriend Allan, their son, Jer-del, and Betty’s other son, Rodriquez lived in the two-bedroom, one-bath home.
 

 The fact that Cortavious is approaching the early teenage years where a child is most susceptible to peer pressure is a concern, given the gang influence in Betty’s neighborhood. Ms. Davis was very concerned that Cortavious was interested in joining a gang. Even Betty admitted to Ms. Davis that gangs were a problem in the neighborhood, and as previously stated, Cortavious has already expressed an interest in gang membership. This is no doubt a major concern in Mr. Shiver’s almost fanatical, but not unfounded, concern over who is watching Cortavious when he is in Betty’s custody.
 

 Finally, there was no testimony by or on behalf of Betty that showed that moving to Arlington would cause an unfavorable impact on Cortavious. The court’s finding that Betty has been there for Cortavious and living at Betty’s was most likely to facilitate stability, give Cortavious different activities and provide people who are going to take care of him is not supported by evidence in this record.
 

 | giRegarding the child’s preference, the court concluded that but for the fact that the parents were divorced, the child would be with both of them. Concluding that this factor favored neither parent, the court stated that it thought that Ms. Shivers is trying to do the best she can to facilitate a good home life for her child.
 

 Our review of Sandi Davis’s testimony is that the child does indeed love both his parents, and he expressed some excitement at the prospect of moving to Arlington. She did not state, however, that Cor-tavious said he wanted or preferred to live with either parent.
 

 On the other hand, we share the trial court’s stated concern that Chris might not facilitate the relationship between the child and his mother. Apparently for a period of four or five months after the separation, Chris might have attempted to thwart the relationship between Cortavious and his mother. Thereafter, it appears that Chris complied with a visitation schedule and Betty exercised her visitation rights.
 

 We also recognize that the trial court is in the best position to observe the parties, and much can be gleaned from a person’s demeanor and attitude during the proceedings. We have no doubt that both Chris and Betty love Cortavious very much. However, Chris’s open defiance of the court’s order to pay child support and spousal support and his attitude toward the court as reflected in the transcript is troubling.
 

 Although we might have ultimately reached a different result, we conclude that the trial court did not abuse its great discretion in denying the motion to relocate Cortavious’s primary residence to Arlington. Therefore we conclude that, for the time being, Betty should remain the domiciliary |22parent under a standard joint custody plan giving Chris twice-
 
 *512
 
 monthly weekend visitation, 8 weeks custody in the summer and school breaks while he is in Arlington. The parties shall exchange custody of Cortavious at a mutually agreeable location half-way between Bossier and Arlington unless otherwise agreed. Accordingly, we remand to the trial court with instructions to implement a joint custody plan under these terms and whatever other customary terms the court deems appropriate in the plan.
 

 Next, Chris complains that the trial court erred in awarding interim spousal support 18 months after the divorce became final. The record shows that Betty filed for this support along with her petition for divorce. For reasons unknown, the matter was not taken up by the previous judge in this case. Nevertheless, Betty is entitled to this support and we therefore affirm the court’s judgment.
 

 Finally, Chris complains that the trial court erred in denying him child support for the two and one-half years he had custody of Cortavious. We agree. During the 2½ years Chris had custody of Cortavious, he supplied all of the child’s needs. The portion of the transcript read into the record indicates that Judge Nesbitt clearly intended to order interim support once he was supplied with the appropriate income information. Chris was clearly entitled to some financial assistance from Betty. The record shows that Betty stipulated that her child support obligation is $255.00 per month. Accordingly, Chris is to be given a credit of $255.00 per month against his $617.00 per month child support obligation to Betty for 30 months, beginning the first month following rendition of this judgment.
 

 [^CONCLUSION
 

 For the foregoing reasons, the judgment denying the petition to relocate is affirmed; the judgment awarding sole custody to Betty Shivers and supervised visitation to Chris Shivers is reversed; we render judgment awarding joint custody of Cortavious to Chris Shivers and Betty Shivers with Betty Shivers to be the domiciliary parent; the judgment awarding spousal support is affirmed; the judgment denying Chris Shivers past child support is reversed; we render judgment awarding Chris 30 months child support in the amount of $255.00 per month to be credited against his monthly child support obligation to Betty; we remand this case back to the district court for the parties to implement a joint custody plan approved by the court in accord with the instructions expressed in this opinion.
 

 REVERSED IN PART; AFFIRMED IN PART; REMANDED.
 

 [1]
 

 . During this period, Judge Nesbitt left the district court. Judge Monty Wyche, serving
 
 pro temp,
 
 issued the interim custody order. Thereafter, beginning on August 18, 2008, Judge Pitman, presided over this case.
 

 [2]
 

 . La. C.C. art. 134 provides that:
 

 Such factors may include: (1) The love, affec
 
 *507
 
 tion, and other emotional ties between each party and the child. (2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child. (3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs. (4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment. (5) The permanence, as a family home, of the existing or proposed custodial home or homes. (6) The moral fitness of each party, insofar as it affects the welfare of the child. (7) The mental and physical health of each party. (8) The home, school, and community history of the child. (9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference. (10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party. (11) The distance between the respective residences of the parties. (12) The responsibility for the care and rearing of the child previously exercised by each party.